UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| BOBBY JONES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| CHALLENGE UNLIMITED, INC., ) | |
| ) | |
| **Serve:   Louis Vlasaty, Registered Agent** ) | |
| **8123 Delmar Blvd, Suite 200** ) | |
| **St. Louis, MO 63130** ) | |
| ) | |
| Defendant. ) | |

Plaintiff Bobby Jones ("Jones" or "Plaintiff")) states the following for his Complaint against Defendant Challenge Unlimited, Inc ("Challenged Unlimited" or "Defendant").

## PARTIES, JURISDICTION, AND VENUE

1. Jones is an adult resident of Pulaski County, Missouri.

2. Jones is Black.

3. Challenge Unlimited is a not-for-profit corporation organized under Illinois law and has its principal place of business in Alton, Illinois.

4. At all times relevant to this case, Challenge Unlimited conducted business in Missouri by performing janitorial services at Fort Leonard Wood through a contract with the United States Army.

5. At all times relevant to this action, Challenge Unlimited was Jones's employer.

6. On or about August 1, 2019, Jones filed a Charge of Discrimination against Challenge Unlimited with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race and retaliation for reporting discrimination based on race.

7. On or about July 12, 2022, the EEOC issued Jones a Notice of Right to Sue.

8. Jones filed this Complaint within 90 days of receiving a Notice of Right to Sue from the EEOC.

9. This Court has subject-matter jurisdiction in this case under 28 U.S.C. §§ 1331 because the Jones asserts claims arising under Title VII of the Civil Rights Act of 1964 ("Title VII), 42 U.S.C.A. § 2000e-2(a)(1), and 42 U.S. Code § 1981.

10. Venue is proper in the Western District of Missouri under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Pulaski County, Missouri.

11. Venue is proper in the Southern Division under Local Rule 3.2(b)(3) because the Jones resides in Pulaski County, Missouri.

## GENERAL FACTUAL ALLEGATIONS

12. Challenge Unlimited provides training and employment opportunities to people with disabilities—referred to as "Clients"—as part of its staffing service contracts with public and private entities—referred to as "Customers."

13. One of Challenge Unlimited's Customers is the U.S. Army, for whome Challenge Unlimited provides janitorial services at Fort Leonard Wood ("Base") in Missouri.

14. Challenge Unlimited hired Jones as a Custodial Crew Leader at the Base in October 2018.

15. Jones reported to Assistant Project Manager Alisha Fitzsimmons ("Fitzsimmons") and Project Manager Andrew Rogers ("Rogers").

16. Jones initially supervised a janitorial crew of six Clients and was responsible for cleaning four buildings—408, 614, 615, and 616—on the Base.

17. One member of Jones's crew—Richard Vasser—was also Black; the other members were all white.

18. When Jones first started, Fitzsimmons told him not to have Vasser sign in and out of Building 408 when they cleaned it.

19. Fitsimmons told Jones that the Army personnel who worked in that building would complain to Challenge Unlimited that the building was wasn't properly cleaned if they knew any of the Clients on the cleaning crew were Black.

20. Similarly, Rogers told Jones that Challenge Unlimited would receive "nothing but complaints" if the cleaning crew in Building 408 included Black Clients.

21. Per their instructions, Jones did not have Vasser sign in and out of Building 408, but Jones signed in an out himself.

22. After a couple of months, Fitzsimmons told Jones he should not sign in and out of 408 either; Jones stopped doing so even though he, Vasser, and the rest of his crew were still responsible for cleaning Building 408.

23. Challenge Unlimited did nothing to protect Jones or Vasser from the racial animus of the Army personnel in Building 408, electing to humor its Customer's bigotry rather than speak out for its own employees and Clients at the risk of losing its lucrative contract with the Army.

24. Challenge Unlimited's Customers were not the only source of racial discrimination Jones faced on the job; he was also harassed by the Clients he supervised and other Challenge Unlimited employees.

25. On his first night, a white Client named Danny Paul told Jones, "I do not like to work with niggers, I've never worked with you guys before and I'm not going to work for you."

26. Jones reported Paul's use of a racial epithet and insubordination to his Fitzsimmons the following morning.

27. Fitzsimmons told Jones, "That's just how he acts" with Black employees.

28. Fitzsimmons did not investigate the situation or even speak with Paul to correct his behavior.

29. When Quality Control Manager Stella Barkley, who is also Black, asked Jones how his new job was going, Jones told her about Paul's racist comments and Fitzsimmons' failure to respond.

30. Barkley told Jones that Paul had made similar racist comments to her, that she had reported his behavior to her own supervisor, and that nothing was ever done about it.

31. Jones also reported Paul's racist statements to Rogers, but Rogers took no action to investigate or correct the problem either.

32. Another white Client named Brier O'Loughlin told Jones and Vasser that he was not used to working with "you people" and that his mother had told him Black people were "weird."

33. O'Laughlin separately told Vasser that his mother didn't want him working with "niggers."

34. O'Loughlin later refused to enter a building until Jones and Vasser exited, telling them, "You Black guys are intimidating and scary."

35. Jones reported this incident to Rogers, who merely laughed while telling Jones and Vasser, "you Black guys *are* intimidating and scary."

36. Jones had to drive O'Loughlin to and from work, during which O'Loughlin repeatedly told Jones he thought Black men were scary and lazy and used racial epithets.

37. Jones, Vasser, and a white Client named Stephen Hall who witnessed it, all reported discriminatory behavior targeted at Black people to Challenge Unlimited, but no corrective action was ever taken.

38. In December 2018, Jones wrote a memorandum outlining the discriminatory treatment he was facing and submitted it to a Human Resources employee named Kimberly Deboe ("Deboe"), along with positive customer comment cards and other documentation he had received showing that his own work performance was good.

39. Jones also told Deboe he had reported discrimination to the anonymous telephone hotline provided to Challenge Unlimited employees to report complaints.

40. Deboe, who is also Black, responded, "I know how it is at Fort Leonard Wood—it's the good old boys."

41. Deboe told Jones if he had any more problems to call her, not the hotline, but she never did anything to investigate his allegations or remediate the discrimination.

42. Although Jones had received many compliments and positive Customer Review Cards for the buildings he supervised, Challenge Unlimited made the following changes to his job responsibilities after he reported racial discrimination and harassment to Fitzsimmons, Rogers, Deboe, and the DOD hotline:

    a. Jones was assigned fewer Clients to clean his buildings than the white Crew Leader, and all Black Clients were placed on Jones's crew.

    b. Jones had to perform the same cleaning tasks as his Clients rather than supervise them.

    c. Jones was told another employee would start checking his work, where he had supervised his own buildings independently before.

d. While Jones was still technically responsible for cleaning all four Buildings, he and his Crew were only allowed to physically enter 614 and 615 while buildings 408 and 616 were cleaned by a white crew.

e. Jones was told he could not independently access cleaning supplies, where he had previously been able to access them on his own.

f. Fitzsimmons's husband, another employee of Defendant, came to Jones's building and permanently removed the buffer, a critical tool Jones frequently used for cleaning floors.

g. Though Jones was no longer permitted to enter buildings 408 and 616 to inspect their cleanliness, he was still held responsible for the quality of the cleaning in those buildings.

43. The stress of rampant, unchecked racial harassment and retaliation at his job took its toll on Jones's health, causing him headaches, fatigue, anxiety, and depression.

44. Eventually, Jones felt so bad his wife took him to the emergency room on ore about January 1, 2019, where his blood pressure was determined to be dangerously high.

45. He was admitted and spent two days in the ICU until his doctors could get his blood pressure under control.

46. Jones had no history of high blood pressure prior to working for Challenge Unlimited.

47. Rather than investigating or remedying the hostile work environment Jones reported, Challenge Unlimited retaliated even further.

48. On January 3, 2019—Jones's first day back from the hospital—Rogers presented him with a corrective action report based on a Customer complaint turned in that day.

49. Jones initially refused to sign the corrective action report because the complaint concerned a day that he was in the hospital.

50. Rogers told him that he had to sign it regardless but that it would not affect Jones's job in any way, so Jones reluctantly signed the form the following week.

51. When Jones reported to work on January 15, 2019, Rogers told him, "Don't clock in, you're fired."

52. Rogers terminated Jones on the spot in front of a group of all White employees, some of whom Jones had been responsible for supervising.

53. Rogers said he was terminating Jones due to Customer complaints, "nonconformance requests," and Jones's failure to sign in and out of Building 408.

54. Prior to being terminated, Jones had never received or even seen any of the nonconformance requests on which Defendant claimed to have based Jones's termination.

55. Some of the complaints that Defendant gave to Jones were related to buildings Jones had no access to at the time the complaints were submitted.

56. Throughout his time working for Defendant, Jones had been told by multiple supervisors to not sign in and out of Building 408, yet his failure to do so was one of the purported reasons for his termination.

57. Jones requested a copy of his employment file from Defendant in March of 2019.

58. When Jones reviewed the copy of his employment file, it contained corrective action reports Jones had never received or seen.

59. Jones's signature had even been forged on the correction action report dated January 11, 2019.

## COUNT I – TITLE VII
## DISCRIMINATION BASED ON RACE

60. Plaintiff restates and incorporates by reference all proceeding allegations of this Complaint as fully set forth herein.

61. Plaintiff's race is a protected class under Title VII.

62. Plaintiff was qualified for his position as Crew Leader at Challenge Unlimited.

63. Defendant discharged Plaintiff's employment in January 2019.

64. Plaintiff's race was a motivating factor in Defendant's decision to terminate him.

65. Defendant's stated grounds for discharging Plaintiff—customer complaints—were pretextual and had never been shared with Plaintiff before he termination.

66. Defendant treated similarly situated white employees more favorably than it treated Plaintiff, permitting them to access buildings and supplies from which Plaintiff and other Black employees were excluded.

67. As a direct and proximate result of his discriminatory discharge, Plaintiff suffered damage, including but not limited to: lost wages and benefits, emotional distress, humiliation, and loss of enjoyment of life.

68. Defendant acted with reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

69. Plaintiff demands to be reinstated or awarded front pay in lieu thereof.

70. Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

## COUNT II – TITLE VII
## HOSTILE WORK ENVIRONMENT BASED ON RACE

71. Plaintiff restates and incorporates by reference all proceeding allegations of this Complaint as fully set forth herein.

72. Plaintiff was qualified for his position as Crew Leader at Challenge Unlimited.

73. While working for Challenge Unlimited, Plaintiff was subjected to harassment by his subordinates, coworkers, and supervisors, including but not limited to, frequent use of racial epithets; pejorative stereotypes that Black men are lazy, scary, and intimidating; less desirable job assignments; lack of access to supplies; exclusion from certain buildings; different sets of rules; and discriminatory write-ups.

74. The harassment Plaintiff endured was unwelcome.

75. The harassment Plaintiff endured was based on his race.

76. The harassment Plaintiff endured was sufficiently severe or pervasive that a reasonable person in the plaintiff's position would find the plaintiff's work environment to be objectively hostile and abusive.

77. Plaintiff subjectively believed the harassment he endured made his work environment hostile and abusive.

78. Defendant knew or should have known of the harassment Plaintiff endured because Plaintiff reported it on multiple occasions to his Rogers, Fitzsimmons, and the hotline.

79. Defendant failed to take prompt and appropriate corrective action to end the harassment Plaintiff endured.

80. As a direct and proximate result of the harassment Plaintiff endured from his subordinates, coworkers, and supervisors, Plaintiff suffered damage, including but not limited to emotional distress, humiliation, and loss of enjoyment of life.

81. Defendant acted with reckless indifference Plaintiff's rights, entitling Plaintiff to punitive damages.

82. Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

## COUNT III – TITLE VII
## RETALIATION

83. Plaintiff restates and incorporates by reference all proceeding allegations of this Complaint as fully set forth herein.

84. Plaintiff was qualified for his position as Crew Leader at Challenge Unlimited.

85. While working for Challenge Unlimited, Plaintiff complained of racially motivated discrimination and harassment to Andrew Rogers, Alisha Fitzsimmons, Kimberly Deboe, and the hotline.

86. Plaintiff reasonably believed the discrimination and harassment of which he complained was based on his race.

87. After Plaintiff complained of discrimination and harassment, Defendant changed his supervisory duties, barred his access from buildings, limited his access to essential supplies, held him responsible for buildings he had no access to clean, and ultimately terminated Plaintiff's employment based on pretextual grounds.

88. Changing one's supervisory duties, barring one's access from buildings, limiting one's access to essential supplies, holding one responsible for buildings he or she has no access to clean, and ultimately terminating one's employment would dissuade a reasonable worker in the same or similar circumstances from making or supporting a charge of discrimination.

89. Defendant would not have changed Plaintiff's supervisory duties, barred his access from buildings, limited his access to essential supplies, held him responsible for buildings he had no access to clean, and ultimately terminated Plaintiff's employment but for Plaintiff's complaints of racial discrimination and harassment.

90. Defendant's stated grounds for discharging Plaintiff—customer complaints—were pretextual and had never been shared with Plaintiff before he termination.

91. As a direct and proximate result of Defendant's retaliation against Plaintiff for complaining of racially motivated harassment and discrimination, Plaintiff suffered damage, including but not limited to: lost wages and benefits, emotional distress, humiliation, and loss of enjoyment of life.

92. Defendant acted with reckless indifference Plaintiff's rights, entitling Plaintiff to punitive damages.

93. Plaintiff demands to be reinstated or awarded front pay in lieu thereof.

94. Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

## COUNT IV – 42 U.S.C. § 1981
## RACE DISCRIMINATION

95. Plaintiff restates and incorporates by reference all proceeding allegations of this Complaint as fully set forth herein.

96. Plaintiff was qualified for his position as Crew Leader at Challenge Unlimited.

97. Defendant discharged Plaintiff.

98. Defendant would not have discharged Plaintiff but for Plaintiff's race.

99. Defendant's stated grounds for discharging Plaintiff—customer complaints—were pretextual and had never been shared with Plaintiff before he termination.

100. Defendant treated similarly situated white employees more favorably than it treated Plaintiff, permitting them to access buildings and supplies from which Plaintiff and other Black employees were excluded.

101. As a direct and proximate result of his discharge, Plaintiff suffered damage, including but not limited to: lost wages and benefits, emotional distress, humiliation, and loss of enjoyment of life.

102. Plaintiff demands to be reinstated or awarded front pay in lieu thereof.

103. Defendant acted with reckless indifference Plaintiff's rights, entitling Plaintiff to punitive damages.

104. Plaintiff is entitled to recover his reasonable attorneys' fees and costs under 42. U.S.C. § 1988.

## DEMAND FOR JURY TRIAL

105. Plaintiff hereby demands trial by jury on all claims triable to a jury.

**WHEREFORE,** Plaintiff Bobby Jones respectfully requests that this Court enter judgment in his favor and against Challenge Unlimited and award Plaintiff compensatory and punitive damages, reinstatement or front pay, litigation costs, reasonable attorneys' fees, post-judgment interest, and such other relief as the Court deems just and proper.

Respectfully submitted,

TGH LITIGATION LLC

*/s/ J. Andrew Hirth*
J. Andrew Hirth
MO Bar No. 57807
28 N 8th St, Suite 317
Columbia, MO 65201
573-256-2850
573-213-2201 (fax)
andy@tghlitigation.com

*Counsel for Plaintiff*